## UNITED STATES v. NORFOLK & W. RY. CO.

(District Court, W. D. Virginia. November 28, 1910.)

RAILROADS (§ 229*)—SAFETY APPLIANCE ACT—CONSTRUCTION—GRABIRONS—"CAR."

  The requirement of the safety appliance act of March 2, 1893, c. 196, § 4, 27 Stat. 531 (U. S Comp. St. 1901, p. 3174), as amended by Act March 2, 1903, c. 976, § 1, 32 Stat. 943 (U. S. Comp. St. Supp. 1909, p. 1143), that it shall be unlawful for any railroad company to use "any car in interstate commerce that is not provided with secure grabirons or handholds in the ends and sides of each car, for greater security to men in coupling and uncoupling cars" applies to passenger cars, and a failure to comply therewith is not excused by the fact that the cars in question were equipped with air hose, steam hose or other appliances affording some measure of protection to employés.

  [Ed. Note.—For other cases, see Railroads, Dec. Dig. § 229.*

  For other definitions, see Words and Phrases, vol. 1, pp. 969, 970; vol. 8, p. 7596.

  Duty of railroad companies to furnish safe appliances, see note to Felton v. Bullard, 37 C. C. A. 8.]

Action by the United States against the Norfolk & Western Railway Company. On motion by defendant to set aside verdict. Overruled.

Barnes Gillespie, U. S. Atty., and Thos. J. Muncy, Asst. U. S. Atty. Roy B. Smith and G. A. Wingfield, for defendant.

McDOWELL, District Judge. In September, 1910, a retrial of this action of debt under the safety appliance act (Act March 2, 1893,

c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]) was held. Counts 3 to 9, both inclusive, of the declaration were based on the absence of handholds in the ends of certain vestibuled passenger coaches used in 1908 in interstate commerce. At the conclusion of the evidence for the government the defendant moved the court to direct a verdict for the defendant as to these counts, on the theory that section 4 of the act does not apply to passenger coaches. This motion was overruled. The defendant thereupon sought to introduce before the jury evidence tending to prove that the presence of air hose, signal hose, steam hose, uncoupling chains, break shaft, dummy coupling chains, hand break shafts, and operating rods of the steam hose rendered handholds in the ends of the coaches unnecessary. Being of opinion that such contention could not properly be left to the decision of the jury, the court excluded the jury and then heard a part of the testimony. The purport of the remainder was merely avowed by counsel. At the conclusion of the testimony both sides moved for a directed verdict as to the counts now in question, and the court directed a verdict for the government as to the said counts. A motion by defendant to set aside the verdict has been made and must be now considered.

Having just concluded an opinion in the case of U. S. v. B. & O. R. Co., 184 Fed. 94, which deals with the meaning of section 4 of the safety appliance act, I shall file herewith a copy thereof, and thus avoid unnecessary labor.

For the purposes of this case it will be assumed that section 4 of the act as a whole is properly a subject of judicial construction. As I read the evidence (Taylor, p. 103, Kearney, pp. 136, 139, 141, 142), it was admitted that the various appliances relied upon as excusing the presence of handholds, while not all in general use, were *not unknown* in 1893, when the safety appliance act was first passed. This statute as appears from its title was enacted "to promote the safety of employés and travelers. * * *" So far as I am aware we have no warrant for assuming that Congress was in 1893 ignorant of the use theretofore made of air hose, etc., and of the measure of protection afforded employés by these appliances. It seems to me therefore a disregard of the plain intent of this statute to hold that the presence of appliances not unknown in 1893 could in any way be considered as excusing compliance with section 4 of the act. As we cannot properly assume that Congress did not know of the use of air hose, steam hose, etc., and as the act plainly intended to promote, to forward, to increase, the safety of employés, a fair interpretation of the Act seems to demand that we construe it as intending to require *protection in addition* to that afforded by the appliances in use to some extent at least prior to the passage of the act. The concluding words of section 4 are, "for greater security to men in coupling and uncoupling cars." I am, to say the least of it, highly doubtful if the reason for using this language was to explain the object in view in enacting section 4. But counsel for defendant necessarily contend that such was the chief, if not the sole, reason for using the language above quoted. If this view be at all sound, it seems to me that the words "greater security" may reasonably be construed

to imply greater security than was afforded by appliances—other than handholds—in use to some extent and not unknown prior to the passage of the act.

An argument made in behalf of the government, which I did not at the trial regard as of great force, and which does not now seem to me to be at all conclusive, is as follows: The appliances in question, except the operating rod of the steam hose, are not strictly *in* the ends of the cars but are *under* the ends of the cars. It is very true that in construing a statute intended to remedy a great evil the courts should be very cautious in taking liberties with the language chosen by the lawmakers. And there is some liberty taken with the language "in the ends of cars" by holding that appliances under the ends of cars might be considered as a compliance with the statute. However, I prefer not to base a decision of the question before me on the somewhat technical point thus presented, which does not in any event apply to the operating rod of the steam hose.

The contention that section 4 of the safety appliance act was never intended to apply to passenger cars deserves some consideration. The original act of 1893 (27 Stat. 531) in terms applied to "any car." In passing the amendment of 1896 (Act April 1, 1896, c. 87, 29 Stat. 85) Congress did not see fit to make any exception as to passenger cars, and the amendment of 1903 (Act March 2, 1903, c. 976, 32 Stat. 943 [U. S. Comp. St. Supp. 1909, p. 1143]) not only does not in the slightest indicate any intention to except passenger cars from the operation of section 4, but it emphasizes the point that the requirements as to couplers, *grabirons,* etc., apply to "all cars" used in interstate commerce.

I think it must be admitted that passenger coaches cannot be uncoupled until the air hose, steam hose, etc., have been uncoupled; and that passenger coaches are not fully coupled until at least the air hose and signal hose have been coupled. In coupling and uncoupling passenger cars therefore it is necessary, notwithstanding the presence of operative automatic couplers, that the men go in between the ends of the passenger coaches. It is also indisputable that after going in between the ends of the cars, just before the employé crouches or kneels down to manipulate the hose pipes, or just after performing such duty, and while the employé is standing up, the cars may suddenly move. To illustrate the point in mind I quote from the cross-examination of the defendant's witness Taylor (page 106, Record):

"Q. Now, I understood you to say that these grabirons as indicated on the end of the coach could not afford any additional security, to the appliances which you have named? A. I did. Q. Suppose that a man was to start in to make this coupling of this hose you have spoken of; that just as he entered the side of the car, the car should move, when he was right at the grabiron, what would prevent him from grabbing the grabiron? A. Nothing. Q. Wouldn't that be a protection to him? A. Undoubtedly so. Q. Then, you mean, if he is in one position alone, bent over down in the center of the car, and the car would move so quickly so he couldn't spring up, that it would afford no protection to him? A. It would not afford any protection to him in that position. Q. But there may be many positions in which he would be inside the wheels, that it would afford him protection, isn't that true? A. Yes, sir."

,Now we cannot assume that Congress was wholly ignorant of the fact that men had to go between the ends of passenger cars to completely couple and uncouple. And whether the witness above quoted is indisputably right or not (and I think he is) in stating that handholds in the ends of passenger coaches would at least at one stage of the proceeding be of assistance, the possibility that he may be right seems to be a sufficient reason for refusing to construe such language as "any car" and "all cars" as not embracing passenger cars.

It is argued that passenger cars are not within the intent of section 4 because, as it is said, there is no place on the sides of passenger cars where handholds would be of use. The answer is that the fact is far from being indisputable. Taylor said the statement was true (page 102), but he must have meant *in addition* to the handholds at the sides of the platform steps. If there is such a thing as a passenger coach which has no handholds in the sides near the ends of the car I cannot recall ever having seen one.

The conclusion I reach is that the motion to set aside the verdict must be overruled and judgment entered in accordance with the verdict.